UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LESAMUEL PALMER, A/K/A
KING ZULU M. ALI SHABAZZ,

           Plaintiff,

v.

                                   Case No. 3:19-cv-780-MMH-MCR

L. HAMPTON, et al.,

           Defendants.

_____

## ORDER

### I. Status

Plaintiff LeSamuel Palmer, an inmate of the Florida penal system, initiated this action on June 28, 2019, by filing a pro se Civil Rights Complaint (Doc. 1). He filed an Amended Complaint (Doc. 6) on August 16, 2019, and a Second Amended Complaint (SAC; Doc. 31) on June 29, 2020.[1] In the SAC, Palmer asserts claims pursuant to 42 U.S.C. § 1983 (related to a May 23, 2019 chemical spraying and cell extraction at Union Correctional Institution (UCI))

_____

[1] In referencing documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

against Defendants L. Hampton, W. Oliver, J. Bryan, and E.A. Biascochea.[2] As relief, Palmer requests monetary, injunctive, and declaratory relief.

This matter is before the Court on Defendants' Motion for Summary Judgment (Motion; Doc. 41). They submitted exhibits in support of the Motion. See Docs. 41-1 through 41-15; S-44. The Court advised Palmer of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motion. See Order (Doc. 7); Summary Judgment Notice (Doc. 43). Palmer filed a response in opposition to the Motion, see Response (Doc. 53), with exhibits, see Docs. 53-1 through 53-4. The Motion is ripe for review.

## II. Plaintiff's Allegations[3]

In his SAC, Palmer alleges that Defendants Hampton, Oliver, and Bryan, as members of a cell extraction team, violated his Eighth Amendment right when they assaulted him in cell 2210 at UCI's V dormitory on the afternoon of May 23, 2019. See SAC at 3-5. Additionally, he states that

---

[2] The Court dismissed Decubellis as a Defendant. See Order (Doc. 48).

[3] The recited facts are drawn from the SAC.

Defendant Biascochea violated his Eighth Amendment right when she authorized the chemical spraying and cell extraction. See id. He also asserts that Biascochea violated his Eighth and Fourteenth Amendment rights when she assigned him to S dormitory where he endured subpar conditions and was treated differently than close management (CM) inmates who were housed in U and V dormitories. See id.

As to the specific underlying facts, Palmer alleges that, after the application of chemical agents, Hampton asked Palmer if he would "submit to cuff[s]," and Palmer said, "yes." Id. at 5. Palmer states that Hampton opened the cell door's flap, and Palmer gave Hampton his clothes. Id. According to Palmer, he obeyed Hampton's directive "to bend over" and "to pull butt cheeks apart," but Hampton ordered Palmer "to repeat it over and over[,] stating [Palmer] didn't do it right." Id. Palmer maintains that he complied. See id. Palmer also avers that Hampton told Lieutenant Jackson that he refused to comply. See id. According to Palmer, Biascochea obtained the Warden's permission for the cell extraction when she knew Palmer had not refused Hampton's orders, and gave the "call order" to Lieutenant Jackson who directed Hampton, Oliver, and Bryan to extract Palmer from the cell. Id. at 6.

Palmer asserts that Hampton, Oliver, and Bryan "rushed in the cell and started beating" him. Id. He states that they kicked and punched him. See id.

3

He maintains that he was nude and screamed he was not resisting Defendants' efforts to restrain him, however, they continued to beat him. See id. According to Palmer, Hampton grabbed Palmer's "penis and balls and pulled and twist[ed] them," and punched the back of Palmer's head "using the handcuffs as brass knockers." Id. He avers that Hampton, Oliver, and Bryan yelled "stop resisting" and continued to assault Palmer until Lieutenant Jackson said, "that's enough," and directed Defendants to "back off." Id. Palmer maintains that Lieutenant Jackson ordered Defendants to clothe Palmer in undershorts. See id. He describes his injuries as a bleeding knot on the back of his head, swollen hands, and difficulties urinating. See id. at 5.

Palmer avers that Biascochea ignored his complaints about Hampton's abuse, and neither reported the abuse nor allowed Palmer to seek medical attention. See id. at 6. According to Palmer, Biascochea refused to give him clothes, bedding, soap, toothpaste, a toothbrush, and tissue in S dormitory. See id. He complains that he ate with cardboard utensils that cut his mouth, drank hot coffee from a "paper cone cup," and was in "full[] restraint[s]" with "a spit mask over his whole head" when he left his cell. Id.

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules(s)), "[t]he court shall grant summary judgment if the movant shows that there is no

4

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

In the Motion, Defendants maintain that there are no genuine issues of material fact, and therefore, the Court should grant summary judgment in their favor as to Palmer's Eighth and Fourteenth Amendment claims against them. <u>See</u> Motion at 8-19. They also assert that they are entitled to qualified immunity. <u>See</u> <u>id.</u> at 19-20. Additionally, they contend that Palmer is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injury resulting from Defendants' acts and/or omissions. <u>See</u> <u>id.</u> at 20-22. In his Response, Palmer maintains that Defendants are not entitled to summary judgment in their favor as to his Eighth and Fourteenth Amendment claims against them. <u>See</u> Response at 5-8, 11-18. He also asserts that he is entitled to compensatory and punitive damages as well as injunctive and declaratory relief. <u>See</u> <u>id.</u> at 9-11, 18-19.[5]

---

[5] Palmer states that he is not seeking monetary damages from Defendants in their official capacities. <u>See</u> Response at 18; <u>see also</u> Order (Doc. 20) at 11.

## V. Law

## A. Excessive Use of Force

Pursuant to the Eighth Amendment to the United States Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. With respect to the appropriate analysis in an excessive use of force case, the Eleventh Circuit has explained:

> [O]ur core inquiry is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992). In determining whether force was applied maliciously and sadistically, we look to five factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates[, as reasonably perceived by the responsible officials on the basis of facts known to them]. . ." Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations omitted).

McKinney v. Sheriff, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam). When considering these factors, courts "must also give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" Cockrell v.

8

Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990)).

"The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) (internal quotations and citations omitted). Indeed, not "every malevolent touch by a prison guard gives rise to a federal cause of action." Id. at 9 (citation omitted). Notably, a lack of serious injury, while not dispositive, is relevant to the inquiry. See Smith v. Sec'y, Dep't of Corr., 524 F. App'x 511, 513 (11th Cir. 2013) (per curiam) (quoting Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (per curiam)). The United States Supreme Court has explained:

> "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.[6] (quoting Whitley,[7] supra, at 321, 106 S.Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . . An inmate who complains of a "'push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Id., at 9 (quoting

---

[6] Hudson, 503 U.S. at 7.

[7] Whitley v. Albers, 475 U.S. 312 (1986).

9

> Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).[8]

> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Wilkins, 559 U.S. at 37-38.

## B. Conditions of Confinement

The Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)). "To establish an Eighth Amendment violation, a prisoner must satisfy both an objective and subjective inquiry regarding a prison official's conduct." Oliver v. Fuhrman, 739 F. App'x 968, 969 (11th Cir. 2018) (citing Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004)). The Eleventh Circuit has explained:

> Under the objective component, a prisoner must allege a condition that is sufficiently serious to violate

---

8 See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

the Eighth Amendment. Id.[ 9 ] The challenged condition must be extreme and must pose an unreasonable risk of serious damage to the prisoner's future health or safety. Id. The Eighth Amendment guarantees that prisoners are provided with a minimal civilized level of life's basic necessities. Id.

Under the subjective component, a prisoner must allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference. Id. This means the prisoner must show that the prison officials: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) displayed conduct that is more than mere negligence. Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

Oliver, 739 F. App'x at 969-70. "To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." Whitley v. Albers, 475 U.S. 312, 319 (1986).

## C. Supervisory Liability

As to supervisory liability, the Eleventh Circuit has stated:

"Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez, 325 F.3d at 1234 (internal quotation marks

---

9 Chandler, 379 F.3d at 1289.

and citation omitted).[10] "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).

"The necessary causal connection can be established 'when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.'" Cottone, 326 F.3d at 1360 (citation omitted).[11] "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Brown, 906 F.2d at 671. A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," Gonzalez, 325 F.3d at 1235, or that a supervisor's "custom or policy . . . resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008) (overruled on other grounds as recognized by Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010) (rejecting the application of a heightened pleading standard for § 1983 cases involving qualified immunity)); see also Keith v. DeKalb Cnty., Ga., 749 F.3d 1034, 1047-48 (11th Cir. 2014). In sum,

---

10 Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

11 Cottone v. Jenne, 326 F.3d 1352 (11th Cir. 2003).

> To state a claim against a supervisory defendant, the
> plaintiff must allege (1) the supervisor's personal
> involvement in the violation of his constitutional
> rights,[12] (2) the existence of a custom or policy that
> resulted in deliberate indifference to the plaintiff's
> constitutional rights,[ 13 ] (3) facts supporting an
> inference that the supervisor directed the unlawful
> action or knowingly failed to prevent it,[14 ] or (4) a
> history of widespread abuse that put the supervisor on
> notice of an alleged deprivation that he then failed to
> correct. See id. at 1328-29 (listing factors in context of
> summary judgment).[15 ] A supervisor cannot be held
> liable under § 1983 for mere negligence in the training
> or supervision of his employees. Greason v. Kemp, 891
> F.2d 829, 836-37 (11th Cir. 1990).

Barr v. Gee, 437 F. App'x 865, 875 (11th Cir. 2011) (per curiam).

### D. Qualified Immunity

The Eleventh Circuit has stated:

> The qualified-immunity defense reflects an
> effort to balance "the need to hold public officials

---

[12] See Goebert v. Lee Cnty., 510 F.3d 1312, 1327 (11th Cir. 2007) ("Causation, of course, can be shown by personal participation in the constitutional violation.").

[13] See Goebert, 510 F.3d at 1332 ("Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations.").

[14] See Douglas v. Yates, 535 F.3d 1316, 1322 (11th Cir. 2008) ("Douglas's complaint alleges that his family informed [Assistant Warden] Yates of ongoing misconduct by Yates's subordinates and Yates failed to stop the misconduct. These allegations allow a reasonable inference that Yates knew that the subordinates would continue to engage in unconstitutional misconduct but failed to stop them from doing so.").

[15] See West v. Tillman, 496 F.3d 1321 (11th Cir. 2007).

13

accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

14

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [plaintiff] to demonstrate that qualified immunity is inappropriate. <u>See</u> <u>id.</u> To do that, [plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), <u>overruled in part on other grounds by</u> <u>Pearson</u>, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified immunity defense, [the plaintiff] must satisfy both showings. <u>Maddox</u>, 727 F.3d at 1120-21 (citation omitted).

<u>Jones v. Fransen</u>, 857 F.3d 843, 850-51 (11th Cir. 2017). The Court has instructed:

Because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified immunity analysis as it relates to his or her actions and omissions. So[,] we must be careful to evaluate a given defendant's qualified immunity claim, considering only the actions and omissions in which that particular defendant engaged.

<u>Alcocer v. Mills</u>, 906 F.3d 944, 951 (11th Cir. 2018).

# VI. Analysis[16]

## A. Eighth and Fourteenth Amendment Claims

Palmer asserts that Defendants Hampton, Oliver, and Bryan violated his Eighth Amendment right when they used excessive force against him during a May 23, 2019 cell extraction. Additionally, he states that Defendant Biascochea violated his Eighth and Fourteenth Amendment rights when she authorized the use of force and placed him on property restriction. Defendants assert that they are entitled to summary judgment as to Palmer's Eighth and Fourteenth Amendment claims against them. In support of their position, Defendants submitted exhibits, including incident reports, Doc. 41-1, the Declaration of Lyndell Hampton (Hampton Decl.), Doc. 41-5; the Declaration of Willie Oliver (Oliver Decl.), Doc. 41-6; the Declaration of Justin Bryan (Bryan Decl.), Doc. 41-7; the Declaration of Kellie Caswell, RN, BSN (Caswell Decl.), Doc. 41-8; Use of Force Authorizations, Doc. 41-9; Use of Force Reports, Doc. 41-10; Property Restriction Reports, Doc. 41-11; the Declaration of Emma Biascochea (Biascochea Decl.), Doc. 41-12; Palmer's deposition (P. Depo),[17]

---

[16] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Palmer. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

[17] Palmer states there are multiple errors in the deposition transcript, however, he only provides one example. See Doc. 56-1 at 3, Errata Sheet.

16

Doc. 41-13; Palmer's Witness Statement, Doc. 41-14; and Palmer's grievances, Doc. 41-15. With the Court's permission, <u>see</u> Order (Doc. 40), Defendants also submitted two digital video discs under seal. <u>See</u> Exhibits Filed Under Seal (Doc. 44); Doc. S-44, Def. Exs. 2, fixed wing recordings; 4, handheld recordings.

In an Incident Report, Lieutenant Jackson provided a chronology of the events with details related to the application of chemical agents, the cell extraction, and property restriction. He stated:

> Inmate PALMER was disrupting the normal operations of the building by continuously beating, kicking[,] and banging on the cell door. At approximately 1300 hours, due to Inmate PALMER'S continuous refusal to cease his disruptive behavior, I contacted Warden T.D. Anderson, who authorized the use of OC Chemical Agents to bring Inmate PALMER into compliance with a lawful order. Lieutenant Robert Oliver, Mental Health Counselor Lenora Smith, and I utilized our Crisis Intervention Training techniques in an attempt to deescalate the situation, to no avail. I then conducted a review of the DC4-650B (Risk Assessment for the Use of Chemical Agents and Electronic Immobilization Devices). It indicated that on May 23, 2019, at the time of the pre-confinement health appraisal, based on a review of the medical record, Inmate PALMER had no known medical conditions that would preclude the use of chemical agents. To confirm that there had been no changes in Inmate PALMER'S medical condition, I contacted LPN Karla Kennedy and she stated that Inmate PALMER had no medical conditions that would preclude the use of chemical agents. A security chain was retrieved and attached to the cell door handle of Inmate PALMER'S cell, and also to the adjacent cell. I instructed Officer Byron Mann to retrieve the U-

Dormitory handheld video camera and begin recording at approximately 1316 hours, with myself conducting a lead in statement. I issued Inmate PALMER a final order and advised him that chemical agents would be administered without further warning if he refused to comply. At approximately 1323 hours, video recording was concluded due to Inmate Palmer momentarily ceasing his actions. At approximately 1335 hours, Inmate PALMER resumed his disruptive behavior. Video recording resumed at approximately 1340 hours, with Officer Mann acting as camera operator. I conducted a lead in statement at that time. Upon arrival at cell front, it was observed that Inmate PALMER had utilized his personal property to cover the cell's observation window. I witnessed Officer Michael Decubellis administer two applications of OC chemical agents, utilizing three (3) one (1) second burst[s] into Inmate PALMER'S cell through the opening of the cell door, while Officer James Cartwright utilized the shield as a precautionary measure.[18] Due to Inmate PALMER utilizing his state-issued mattress and bed linens in an attempt to block the effects of chemical agents, it is unknown if the chemical agents made contact with him. Due to Inmate PALMER blocking the effects of chemical agents, Warden Anderson was contacted and authorized the use of CS chemical agents. I witnessed Officer Decubellis administer one application of CS chemical agents, utilizing three (3) one (1) second burst[s] into Inmate PALMER'S cell. The cell door was then secured. Due to Inmate PALMER utilizing his state-issued mattress and bed linens in an attempt to block the effects of chemical agents, it is unknown if the chemical agents made contact with him. The chemical agents had no effect on Inmate PALMER and he continued to refuse all orders to submit to restraint procedures. I contacted Warden Anderson and advised

---

[18] See Doc. 41-1 at 1-2 (Decubellis' Incident Report); see id. at 9 (Cartwright's Incident Report).

her of Inmate PALMER'S continuous refusal and the ineffectiveness of chemical agents. Duty Warden Anderson authorized the use of a forced cell extraction to remove Inmate PALMER from his cell. I instructed Officer Dominic Ellis to retrieve a second handheld camera. Two cameras were used during this incident so that one camera could remain cell front while a lead in statement and team introduction was conducted for the cell extraction on the second camera. There was no lapse in recording during this incident. Video recording on the second camera began at approximately 1419 hours, at which time I conducted my lead in statement. At approximately 1422 hours, once the team assembled cell front, I conducted a closing statement, at which time video recording on the first handheld camera concluded. Inmate PALMER was ordered to submit to restraint procedures, to which he initially complied; however, he refused to comply with proper strip search procedures. The cell door was breached at which time the cell extraction team entered the cell. The team members forced Inmate PALMER to the cell floor where they gained control of his extremities. Once all restraints were applied, Inmate PALMER was pinned to [the] cell floor while boxers were placed on Inmate PALMER to prevent the recording of nudity. Inmate PALMER was assisted to his feet and escorted to the Quad 2 cold water shower. Inmate PALMER was instructed not to use soaps or lotions during his shower. Once Inmate PALMER'S decontamination shower was complete, he received a clean shroud. At approximately 1440 hours, Inmate PALMER made allegations of staff abuse and PREA [(Prison Rape Elimination Act)]. It should be noted that Inmate PALMER did not give specific details or staff members['] names regarding his PREA allegation. Inmate PALMER was then escorted to the V-Dormitory Medical Treatment Room where he received a post use of force physical, conducted by LPN Kennedy with no injuries noted. Upon completion of

his medical assessment, Inmate PALMER was escorted to S-Dormitory, where he was rehoused in cell S3109S. Video recording was continuous and uninterrupted and concluded at approximately 1455 hours. Inmate PALMER was monitored for (60) minutes by Officer Dominic Ellis following the use of chemical agents, with no signs of respiratory distress noted. Cell V2210L and the shower were decontaminated. The digital handheld camera was downloaded to a DVD. The DVD, with a DC1-801 (Chain of Custody) attached, was placed in the Use of Force box located in the Colonel's Office Hallway. All staff involved received a post use of force physical, with no injuries noted. The following forms were completed and included in the use of force packet: DC4-701C (Emergency Room Record),[19] DC4-708 (Diagram of Injury),[20] DC6-216 (Chemical Agent Accountability Log), and [a] DC6-232 (Authorization of Use of Force).[21] This incident was noted on Inmate PALMER'S DC6-229 (Daily Record of Special Housing). Duty Warden Anderson was notified of the outcome of this incident.

. . . .

Inmate PALMER is in violation of F.A.C. Chapter 33-601.314 rules of prohibited conduct and will be receiving a disciplinary report for disciplinary infraction[]: (2-3) [c]reating a minor disturbance.[22] Due [to] Inmate PALMER utilizing his personal property to cover the cell's observation window and

---

[19] See Caswell Decl. at 25 (noting "[t]wo hematomas to back of the head").

[20] See Caswell Decl. at 26 ("Two hematomas to back of head. They were not bleeding at time of assessment.").

[21] See Doc. 41-9.

[22] See Doc. 41-3, Inmate Disciplinary Actions.

utilizing his state-issued mattress and bed linens in an attempt to block the effects of chemical agents, Warden Anderson authorized for Inmate Palmer to be placed on property restriction. Under my supervision, Inmate PALMER was placed on temporary property restriction due to the misuse of his state-issued mattress, linens, and personal property. Inmate PALMER was counseled and advised of the reason for the property restriction. Inmate PALMER is authorized to possess a pair of state issued boxers, along with appropriate health and comfort items and approved footwear. At no time will Inmate PALMER be left without a means to cover himself. Sergeant Robert Castleberry and Officer Eric Prock inventoried Inmate PALMER'S personal property. Officer Prock secured Inmate PALMER'S property in the Main Property Room, along with the DC6-220 attached. I have reviewed the property being restricted and confirmed that the DC6-220 (Inmate Impounded Personal Property List) reflects the correct property restricted and staff has signed the DC6-220. Inmate PALMER was not present when the property was inventoried; therefore, he was unable to sign the DC6-220. Inmate PALMER received a copy of the DC6-220. A Restriction Memo was completed and placed on Inmate PALMER'S cell door. A Property Restriction Form was completed and forwarded to the Chief of Security.[23] This incident was forwarded to the Chief of Security and the Assistant Warden's Office for further review and possible MINS entry.

Doc. 41-1 at 1-8.

---

[23] See Doc. 41-11 at 3 (noting property restriction is not to exceed 72 hours).

Officer Michael Decubellis also provided a description of the circumstances leading up to the cell extraction.[24] He stated:

> At approximately 1335 hours, on Thursday, May 23, 2019, while assigned as U-Dormitory Housing Officer, I was summoned to V-Dormitory by Lieutenant Eric Jackson for a possible organized use of chemical agents involving Inmate PALMER, LeSamuel – DC #L41847 (V2210L). Upon my arrival, Lieutenant Jackson informed me that Inmate PALMER was disrupting the normal operations of the building by continuously beating, kicking[,] and banging on the cell door. Upon arrival at cell front, it was observed that Inmate PALMER had utilized his personal property to cover the cell's observation window. At approximately 1342 hours, the cell door was breached and under the direct supervision of Lieutenant Jackson, I administered three (3) one (1) second burst[s] of OC Chemical Agents canister #457585 into Inmate PALMER'S cell, while Officer James Cartwright utilized the shield as a precautionary measure. Due to Inmate PALMER utilizing his state-issued mattress and bed linens in an attempt to block the effects of chemical agents, it is unknown if the chemical agents made contact with him. At approximately 1353 hours, under the direct supervision of Lieutenant Jackson, I administered three (3) one (1) second burst[s] of OC chemical agent canister #5532747 into Inmate PALMER'S cell, as Officer Cartwright utilized the shield as a precautionary measure. Due to Inmate PALMER utilizing his state-issued mattress and bed linens in an attempt to block the effects of chemical agents, it is unknown if the chemical agents made contact with

---

[24] Palmer voluntarily dismissed Decubellis as a Defendant in the action. See Voluntary Dismissal (Doc. 46). In doing so, Palmer stated that Decubellis "didn't participate in the unlawful use of force upon [him]" and that "Decubellis was not a part of the cell extraction team. . . ." Id.

him. Due to the first two applications of chemical
agents being ineffective, Warden Tony Anderson was
contacted, and authorized the use of CS chemical
agents. Inmate Palmer continued to refuse to comply
with restraint procedures. At approximately 1404
hours, under the direct supervision of Lieutenant
Jackson, I administered three (3) one (1) second
burst[s] of CS chemical agent canister #5484598 into
Inmate PALMER'S cell, as Officer Cartwright utilized
the shield as a precautionary measure. Due to Inmate
PALMER utilizing his state-issued mattress and bed
linens in an attempt to block the effects of chemical
agents, it is unknown if the chemical agents made
contact with him. No further force was used by me. It
should be noted that I am certified in the use of
chemical agents and my chemical agents[] card expires
in September of 2019. This incident was referred to the
Shift Supervisor for further disposition.

Id. at 1-2.

In a Declaration, Defendant Biascochea describes her role during the

events that transpired on May 23, 2019. She states in pertinent part:

I have reviewed the second amended complaint
filed by inmate LeSamuel Palmer (FDC #L41847) and
I am aware of the allegations against me. These
allegations pertain to an organized use of force that
occurred on May 23, 2019. Plaintiff alleges that I
authorized [the] use of chemical agents and a cell
extraction on him. He further alleges that I housed
him in S-Dorm and denied him certain items including
clothes, bedding, soap, toothpaste, toothbrush[,] and
tissue.

**I did not authorize the use of chemical
agents or the cell extraction of Plaintiff on May
23, 2019.** FDC rules require the Warden or someone
designated by the Warden to authorize a use of force.

23

Uses of force that occur during normal business hours (Monday through Friday 8:00 a.m. to 5:00 p.m.) are typically authorized by the Warden. However, if the Warden is not available, a person designated by the Warden can authorize the use of force. Those designated persons include the Assistant Warden of Operations, the Assistant Warden of Programs, the Colonel, the Classification Supervisor, and myself as the Major. The Duty Warden is typically responsible for authorizing uses of force that occur outside of normal business hours.

**The use of force occurred on Thursday, May 23, 2019 during normal business hours and was authorized by the Warden as reflected on the Authorizations of Use of Force Forms.**[25]

**I authorized Plaintiff to be placed on property restriction on May 23, 2019**. FDC rules permit the restriction of an inmate's personal and/or state issued property when they are misused. [26] Such property restrictions are common practice.

Plaintiff was placed on property restriction because he used his personal property to cover the window on his cell door which prevented staff from seeing inside his cell. This presents a security concern and is against FDC rules. Plaintiff also utilized his state issued property, specifically his mattress, bed linens, and clothing to block the chemical agents. Due to this misuse of his personal and state issued property, Plaintiff was placed on property restriction for a period not to exceed 72 hours.

Plaintiff was not denied a toothbrush, toothpaste, soap[,] or tissue. While inmates on

---

[25] <u>See</u> Doc. 41-9.

[26] <u>See</u> Doc. 41-11.

property restriction may have items purchased from the commissary removed, including items such as toothpaste and soap, they are provided replacement items during the course of the restriction.

**Plaintiff alleges that I made the decision to house Plaintiff in S-Dorm. I did not make this decision.** At the time of this use of force, S-Dorm housed Close Management inmates. The Warden decided who was housed in S-Dorm.

Biascochea Decl. at 1-2 (emphasis added and paragraph enumeration omitted).

Next, Defendants Hampton, Oliver, and Bryan explain their roles as members of the cell extraction team. In a Declaration, Hampton states in pertinent part:

I have reviewed the second amended complaint filed by inmate LeSamuel Palmer (FDC #L41847) and I am aware of the allegations against me. These allegations pertain to an organized use of force that occurred on May 23, 2019 where I was part of the cell extraction team.

Specifically, Plaintiff alleges that prior to the cell extraction, I conducted strip procedures on Plaintiff. He alleges that he complied with the strip procedure. Plaintiff further alleges that during the cell extraction, I punched and kicked him and used handcuffs as "brass knockers" to hit him in the back of his head. He also alleges that I pulled and twisted his genitals to cause pain.

**Plaintiff's claims are absolutely not true. Plaintiff failed to comply with the strip procedure. At no time did I punch, kick, or otherwise "beat" Plaintiff. At no time did I grab, pull[,] or twist Plaintiff's genitals.**

25

On May 23, 2019, I was working confinement in another dorm when I was summoned to V-Dormitory for a possible cell extraction of Plaintiff. When I arrived at the dorm, I assembled with the other cell extraction team members. There were five (5) members of the cell extraction team. Each team member was assigned a number and had assigned responsibilities upon entry of the cell. **I was team member #2 and was responsible for the upper right quadrant of Plaintiff's body and applying hand restraints.**

Pursuant to FDC procedure, the members of the cell extraction team were placed on hand-held video. Lt. Jackson provided a lead in statement which included the date and time of the recording, the location of the recording, and a brief description of the events that occurred prior to assembly of the cell extraction team. The team members, who were lined up in numerical order, stated their name, their assigned number[,] and their assigned responsibilities during the cell extraction. Lt. Jackson then provided standard instructions to the cell extraction team members and the camera operator.

I, along with the other members of the cell extraction team, went to Plaintiff's cell which was located on the second floor of the dormitory. The team members walked to the cell in numerical order with the #1 team member at the front of the line.

Once the team arrived at Plaintiff's cell, he was given an order to submit to restraint procedures by Lt. Jackson. **As the #2 member of the team[,] I was able to see inside Plaintiff's cell. Plaintiff initially complied with the procedures by removing all his clothing. However, he refused to comply with strip procedures. I instructed Plaintiff to back up, turn around and bend at the**

**waist and cough. Plaintiff failed to bend at the waist. I again instructed Plaintiff to bend at the waist. He again[] failed to bend at the waist. I then notified Lt. Jackson that Plaintiff was not bending at the waist. Lt. Jackson came to the cell window and instructed Plaintiff to squat and cough. Plaintiff failed to comply. Due to Plaintiff's failure to comply, his cell door was breached.**

I entered the cell after the #1 team member. The #1 team member used a shield to get Plaintiff on the ground. After Plaintiff was on the ground, I grasped Plaintiff's right arm and forced it behind his back. **When the #3 team member secured Plaintiff's left arm, I applied the handcuffs. Plaintiff was resisting efforts to be restrained in the handcuffs. Once all restraints were applied, I pinned Plaintiff's upper torso to the ground while boxers were obtained for Plaintiff.**

Hampton Decl. at 1-3 (emphasis added and paragraph enumeration omitted).

Defendants Oliver and Bryan provide similar accounts. In a Declaration,

Oliver states in pertinent part:

**Plaintiff's claims are absolutely not true. At no time did I punch, kick, or otherwise "beat" Plaintiff.**

. . . .

**I was team member #5 and was responsible for the lower left quadrant of [Palmer]'s body.**

. . . .

I was unable to see inside Plaintiff's cell during the strip search procedure. However, it was indicated by

> another team member and Lt. Jackson that Plaintiff
> was not complying. I have no reason to believe that
> Plaintiff was complying with strip procedures.
>
> Due to Plaintiff's failure to comply, his cell door
> was breached. I was the last team member to enter the
> cell. After Plaintiff was on the ground, I grasped
> Plaintiff's left leg and pinned it to the cell floor. After
> Officer Bryan pinned Plaintiff's right leg, **I pinned
> both of Plaintiff's leg[s] to enable Officer Bryan
> to release his grasp and apply leg restraints.
> Plaintiff was resisting efforts to be placed in
> restraints. Once the restraints were applied, I
> released my grasp and did not use any further
> force.**

Oliver Decl. at 1-2 (emphasis added and paragraph enumeration omitted).

Additionally, Bryan similarly avers that he never punched, kicked, or

otherwise beat Palmer. See Bryan Decl. at 1. Like Oliver, Bryan was unable to

see inside Palmer's cell during the strip search procedure due to his fourth

position in line waiting for a directive to enter the cell. See id. at 2. He states

in pertinent part:

> I entered the cell after team members 1-3. After
> Plaintiff was on the ground, I grasped Plaintiff's right
> leg and pinned it to the cell floor until Sergeant Oliver
> was able to gain control of both Plaintiff's legs. At that
> time, I applied leg restraints. Plaintiff was resisting
> efforts to be placed in restraints. Once the restraints
> were applied, I released my grasp and did not use any
> further force.

Id. (paragraph enumeration omitted).

To defeat the Motion, Palmer is required to present evidence to show that there is a genuine issue for trial. In opposing Defendants' Motion, Palmer asserts that Defendants are not entitled to summary judgment. He submitted the Declarations of S-dormitory inmates, see Docs. 53-2 at 2-3, and V-dormitory inmates, see id. at 4, 7, as well as his own Declaration, see id. at 5-6 (Palmer Decl.), in support of his contentions. In his Response, Palmer describes the beating as "assaulting the plaintiff with close[d] hands (fist), knee jabbing" and "using the handcuffs as brass knockers." Response at 4. He also provides details related to his attempt to comply with orders before Defendants removed him from his cell, and asserts that "just because [he] didn't fully follow [the] order" due to mental issues, Defendants still used excessive force. Id. at 15. In a Declaration, Palmer provides a factual account that is similar to the allegations in his SAC. He states in pertinent part:

> Lt. Jackson came back to the cell and order[ed] for the handheld camera to be changed out. And asked me was I[] going to submit to handcuff[s] and I stated, "yes." I handed my clothes (that … remained on – boxers and t-shirt) to Officer Hampton [a]nd was going through the procedure of strip searching. While standing naked I did the search procedure. And Officer Hampton stated I didn't do it right[,] so Lt. Jackson came to the door and told me to repeat the procedure. When I did as told[,] **Lt. Jackson order[ed] the cell extraction team to "line it up" and order[ed] the team to run into the cell….**

29

> **The cell extraction team ran in and started punching on me [and] la[i]d on top of me. Officer Hampton started beating me on the back of the head with handcuffs. H[e] and other officers start[ed] sexually rubbing the[m]sel[ves] against me. Officer Hampton grabbed my manhood, etc. while other officer[s] continue[d] to beat on me.** They kept up the action until Lt. Jackson called off the assault "ya[']ll back off." The handheld video will hear Lt. Jackson stating that I had on "no" clothes [a]nd order[ed] another officer to bring me some boxers (undershorts).

Palmer Decl. at 5-6 (emphasis added and selected punctuation deleted). At his deposition, Palmer similarly maintained that the cell extraction was unnecessary because he had complied with Lieutenant Jackson's and Hampton's directives, and that Hampton, Oliver, and Bryan used excessive force. See P. Depo at 20-21, 42-56, 71-72.

The parties agree that the video evidence generally captures the May 23, 2019 use of chemical agents, the cell extraction, the post-use-of-force decontamination shower, Nurse Kennedy's medical assessment, and the escort to S dormitory.[27]  However, they disagree as to what the recording shows inside

---

[27] Defendants' exhibit 2 contains seven video recordings with various views from fixed wing (FW) cameras. The FW footage provides a general chronology of the May 23, 2019 events: first chemical agent application (1:42 p.m.), second chemical agent application (1:53 p.m.), third chemical agent application (2:04 p.m.); 2:25 p.m. cell extraction; 2:31 p.m. decontamination shower; 2:40 p.m. medical assessment; 2:43 p.m. escort to S dormitory; 2:55 p.m. arrival at S dormitory cell. Defendants' exhibit 4 contains three video recordings from a handheld (HH) camera: HH1 (Lieutenant Jackson's final order); HH2 (use of chemical agents); and HH3 (cell extraction).

the cell where Hampton, Oliver, and Bryan worked together to restrain Palmer during the cell extraction. The parties generally cite to the handheld video footage and argue that the video evidence supports their factual accounts as to how the cell extraction unfolded. See Motion at 2-5; Response at 2-4.

The video evidence shows that Lieutenant Jackson gave Palmer a final order to cease his disruptive behavior, and Palmer seemed compliant. See Def. Ex. HH1. The video evidence also reflects that Palmer had covered the entire window of his cell door with paper which prevented staff from seeing inside Palmer's cell. See Def. Ex. HH2. At his deposition, Palmer acknowledged that he had violated prison policy when he covered his cell window with paper to thwart the officers' efforts and block the chemical agents. See P. Depo at 30-31. After the first application of chemical agents, Palmer continued his disruptive behavior by loudly chanting. See Def. Ex. HH2. After the second application, he continued chanting and yelling "Zulu Warrior." Id. After the third application, Palmer continued to chant about the Zulu nation. See id. Other inmates joined Palmer's lead and yelled, "Zulu, Zulu, Zulu." Id. At his deposition, Palmer acknowledged that he yelled to other inmates about the Zulu nation. See P. Depo at 32-35. The FDOC issued a disciplinary report to Palmer for participating in a disturbance. See Docs. 41-1 at 6-7; 41-3.

The Court first addresses Defendant Biascochea's involvement in the incident. To the extent Palmer intends to hold Biascochea liable based on her position as a "Major" within the Florida Department of Corrections (FDOC), see Response at 12 (citing Doc. 53-1 at 4), the law is well-settled that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. Next, as to Palmer's assertion that Biascochea authorized the chemical spraying and cell extraction, it is undisputed that FDOC Rule 33-602.210(5)(c)1. provides that "[t]he warden or designee shall be consulted and his or her written Authorization for Use of Force, Form DC6-232, must be obtained for any organized use of force prior to the application of chemical agents." Fla. Admin. Code r. 33-602.210(5)(c)1. Thus, Biascochea did not have the power to authorize the use of force. See Biascochea Decl. at 2, ¶¶ 3-4; see also Doc. 41-9. Rather, Warden Anderson authorized the force used on May 23, 2019, as reflected in the Authorizations for Use of Force forms. See Doc. 41-9 (two applications of OC chemical agents; third application of CS chemical agents; and cell extraction). In an incident report, Lieutenant Jackson acknowledged that Warden Anderson had authorized the use of force. See Doc. 41-1; see also Def. Ex. HH1. On this record, no reasonable jury could conclude that Biascochea authorized the use of chemical agents on Palmer and the cell

extraction. As such, Defendants' Motion is due to be granted as to Palmer's Eighth Amendment claim (that Biascochea authorized the chemical spraying and cell extraction) against Defendant Biascochea.

The parties agree that Palmer violated the FDOC rules when he covered his cell window and caused a cellblock disturbance. See Biascochea Decl.; P. Depo at 30. In a Declaration, Biascochea states that she authorized Palmer's placement on 72-hour property restriction because Palmer had used his personal property to cover the window on his cell door which prevented staff from seeing inside his cell, thus causing a security risk. See Biascochea Decl. at 2. She explains that the FDOC rules "permit the restriction of an inmate's personal and/or state issued property when they are misused" and that "[s]uch property restrictions are common practice." Id. Notably, Palmer was counseled and advised of the reason for the property restriction, and knew that it would be temporary. See Doc. 41-11 at 1.

To state a claim that his conditions of confinement violated the Eighth Amendment, a prisoner must allege that the defendant was deliberately indifferent to conditions that were "sufficiently serious." Chandler, 379 F.3d at 1288. Conditions of confinement are sufficiently serious under the Eighth Amendment only if they are so extreme that they expose the prisoner to "an unreasonable risk of serious damage to his future health or safety." Id. at 1289.

33

Allegations of merely harsh conditions do not state a claim under the Eighth Amendment. Id. Palmer's assertions related to the 72-hour property restriction fail to suggest that Biascochea deprived him of the "minimal civilized measure of life's necessities" or that the conditions of his confinement posed an unreasonable risk of serious harm to his future health or safety. Id.; see also Turner v. Warden, GDCP, 650 F. App'x 695, 701-02 (11th Cir. 2016); O'Connor v. Kelley, 644 F. App'x 928, 932 (11th Cir. 2016). The property restriction and any deprivation of hygiene items were short-lived, and Palmer's health did not significantly deteriorate as a result of the property restriction. See Doc. 41-11. The Court finds that the 72-hour property restriction that Palmer endured in S dormitory, as described by Palmer, is not the sort of extreme condition that violates contemporary standards of decency. Nor has Palmer asserted that Biascochea had subjective knowledge of any risk of serious harm to Palmer. As such, Defendants' Motion is due to be granted as to Palmer's Eighth Amendment claims (related to the property restriction in S dormitory) against Defendant Biascochea.

Additionally, Palmer asserts that Biascochea failed to report Palmer's PREA complaint against Hampton. According to Palmer, he told "everyone" (including the nurse, the site counselor, the mental health counselor, and the disciplinary hearing officers) about Hampton's abuse towards him during the

cell extraction. P. Depo at 56. He testified that he told Biascochea that he had a "criminal complaint," but did not tell her anything else because she did not like him and would not talk to him. Id. at 56-57. Notably, Warden Anderson also knew about Palmer's PREA complaint and acknowledged Palmer's assertions in an incident report. See Doc. 41-1 at 1. Given the record, including that the administration was well aware of Palmer's PREA complaint against Hampton, Palmer's contentions regarding Biascochea's alleged failure to report his generalized complaint fails to support any conclusion that she violated a constitutional right. As such, Defendants' Motion is due to be granted as to Palmer's Eighth Amendment claim against Biascochea.

Finally, Palmer asserts that Biascochea violated his Fourteenth Amendment right to equal protection of the law. He maintains that while he was in S dormitory, he was treated differently from other CM inmates who were housed in U and V dormitories. He believes that CM inmates should not have been housed in S dormitory. See SAC at 6. According to Biascochea, she did not authorize Palmer's assignment to S dormitory. See Biascochea Decl. at 2. Rather, the Warden assigned inmates to S dormitory, which housed CM inmates at that time. See id. To establish a claim cognizable under the Equal Protection Clause, an inmate must show that "(1) he is similarly situated to other prisoners who received more favorable treatment[,] and (2) the state

engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis." Sweet v. Sec'y, Dep't. of Corr., 467 F.3d 1311, 1318-19 (11th Cir. 2006) (citing Jones v. Ray, 279 F.3d 944, 946-47 (11th Cir. 2001); Damiano v. Fla. Parole and Prob. Comm'n, 785 F.2d 929, 932-33 (11th Cir. 1986)). Taking Palmer's assertions as true, as the Court must, he provides no facts that Biascochea discriminated against him on some constitutionally protected basis. As such, Defendants' Motion is due to be granted as to Palmer's Fourteenth Amendment equal protection claim against Defendant Biascochea.

Next, the Court turns to Defendants Hampton, Oliver, and Bryan's involvement in the use of force against Palmer during the cell extraction. Defendants assert that they are entitled to summary judgment as to Palmer's Eighth Amendment claims against them because they did not use any unnecessary force against Palmer as they restrained him inside the cell. They maintain that the video evidence supports their version of the facts that they neither kicked nor punched him, but used only force necessary to restrain Palmer. See Motion at 14-15. They argue that "[t]he video recording is in stark contradiction to the type of violent encounter depicted by [Palmer]." Id. at 15. Palmer contends that Hampton, Oliver, and Bryan are not entitled to summary

judgment in their favor, and that the video evidence supports his version of the facts.

The handheld video footage captures the cell extraction team entering Palmer's cell and then exiting the cell less than five minutes later. See Def. Exs. HH3; FX1 (2:25 p.m. to 2:29 p.m.). However, the Court is neither able to see each Defendant's specific actions during the restraint process nor Palmer's compliance, or lack thereof. See HH3 at 5:27-6:40. The camera operator pointed the camera towards the ceiling (presumably because Palmer was nude),[28] and therefore, the Court is unable to see the particular movements of the involved parties inside the cell where Defendants worked together to restrain Palmer. Additionally, Lieutenant Jackson oversaw Hampton, Oliver, and Bryan's actions, and Jackson's physical frame obstructed the camera's view of each Defendant's movements. Also, the camera operator (along with others) coughed (presumably due to chemical agents lingering in the air), and therefore, the Court is unable to hear some of the conversations among Jackson, Defendants, and Palmer. Undoubtedly, there was a rapidly evolving physical confrontation in the cell, as Defendants secured Palmer in restraints and put boxer shorts on

---

[28] See Doc. 41-1 at 4 ("Once all restraints were applied, Inmate Palmer was pinned to [the] cell floor while boxers were placed on [him] to prevent the recording of nudity.") (capitalization omitted).

him. Defendants maintain, see Motion at 17, and this Court agrees, that the extraction team fully restrained Palmer's hands and legs in approximately one minute, placed boxer shorts on him, and left the cell with Palmer for an escort to a decontamination shower where Palmer arrived at 2:31 p.m. Nevertheless, the video footage does not capture the individual movements of each Defendant while inside the cell.[29]

While the video evidence provides a detailed chronology of how the events generally unfolded, it fails to capture Defendants' extraction efforts and their specific interactions with Palmer inside the cell. Given the differences in Palmer's sworn recollection[30] and the contemporaneous narratives provided in incident reports coupled with Caswell's and Defendants' Declarations, there remain genuine issues of material fact as to the extent to which Palmer failed to comply with orders, whether Defendants Hampton, Oliver, and Bryan appropriately used force to restrain Palmer and extract him from the cell, and

---

[29] Defendants rely on their Declarations when they describe what happened while they were inside Palmer's cell as they worked together to apply Palmer's restraints. See Motion at 5. Defendants also cite to the video footage at time stamps 5:26 through 6:31, see id. at 5, 15, 17, however, that portion of the recording is inconclusive because it does not capture Defendants' specific actions. See Def. Ex. HH3.

[30] See P. Decl.; see also generally P. Depo.

38

whether the force used was excessive, causing Palmer's lasting injuries.[31]  As such, Defendants' Motion as to Palmer's Eighth Amendment claims related to the cell extraction against Defendants Hampton, Oliver, and Bryan is due to be denied.

## B. Qualified Immunity

Defendants assert that they are entitled to qualified immunity because they did not commit any federal statutory or constitutional violation. See Motion at 19-20. Under the doctrine of qualified immunity, a defendant may be protected from claims for monetary damages against him in his individual capacity. Here, it is undisputed that Defendants were engaged in discretionary functions during the events at issue. Thus, to defeat qualified immunity with respect to each Defendant, Palmer must show both that the specific Defendant committed a constitutional violation, and that the constitutional right violated was clearly established at the time. Indeed, the Eleventh Circuit has instructed that, in determining the applicability of qualified immunity, the Court must "parse" the actions each Defendant undertook, and "address the evidence as it pertains solely to" that defendant. Alcocer, 906 F.3d at 952.

---

[31] The video evidence shows that Nurse Kennedy examined the back of Palmer's head in the V dormitory medical treatment room, and Palmer pointed to the back of his head when the camera operator recorded him in the S dormitory cell. See Def. Ex. HH3. Notably, Palmer did not appear to be suffering any physical hardship when officers escorted him on a nine-minute walk from V dormitory to S dormitory. See Def. Exs. FW5-FW7.

Upon review of the record and the parties' arguments, the Court finds that Defendant Biascochea is entitled to qualified immunity from monetary damages in her individual capacity as to Palmer's Eighth and Fourteenth Amendment claims against her. However, at this summary judgment stage of the proceedings, genuine issues of material fact preclude a finding that Defendants Hampton, Oliver, and Bryan are entitled to the benefit of qualified immunity as to Palmer's Eighth Amendment claims against them. As such, Defendants' Motion as to their assertion of qualified immunity is due to be granted in part and denied in part.

### C. Physical Injury

Next, the Court turns to Defendants' assertions that Palmer is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injuries that are more than <u>de minimis</u>, resulting from Defendants' acts and/or omissions. At issue is 42 U.S.C. § 1997e(e), which reads:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act....

42 U.S.C. § 1977e(e). To satisfy § 1997e(e), a prisoner must assert physical injury that is more than <u>de minimis</u>. However, the injury does not need to be

significant. <u>See</u> <u>Thompson v. Sec'y, Fla. Dep't of Corr.</u>, 551 F. App'x 555, 557 (11th Cir. 2014) (citation omitted). Until recently, the Eleventh Circuit read this statute to mean that "an incarcerated plaintiff cannot recover either compensatory or punitive damages for constitutional violations unless he can demonstrate a (more than <u>de</u> <u>minimis</u>) physical injury." <u>Brooks v. Warden</u>, 800 F.3d 1295, 1307-08 (11th Cir. 2015). However, in <u>Hoever v. Marks</u>, 993 F.3d 1353 (11th Cir. 2021), the Eleventh Circuit reexamined § 1997e(e)'s physical injury requirement and precisely defined its limitation on the damages a prisoner can recover for constitutional violations. The court held and instructed "the district court to dismiss only a request for compensation for an alleged mental or emotional injury in the absence of an alleged physical injury." <u>Id.</u> at 1361. It reasoned that "a plaintiff – at least one alleging a constitutional violation – need not allege a compensable injury to seek punitive damages, so long as he plausibly alleges that the underlying misconduct was willful or malicious." <u>Id.</u>

Taking Palmer's allegations as to his injuries as true, he asserts physical injuries that are greater than <u>de</u> <u>minimis</u>. Palmer asserts that the back of his head was bleeding from the blows, <u>see</u> SAC at 5, however, Nurse Kennedy noted there were two hematomas that were not bleeding, <u>see</u> Doc. 41-8 at 26. As relief, Palmer asks that the Court direct the FDOC to "medically remove[]"

the knot on his head. Id. Additionally, Palmer asserts that Defendant Hampton grabbed and twisted Palmer's genitals. See SAC at 6. According to Palmer, he suffered pain while urinating for "close to a month" as a result of the genital injury. See P. Depo at 60.

The Court finds that Palmer's alleged injuries cross §1997e(e)'s de minimis threshold. See Thompson, 551 F. App'x at 557 n.3 (describing an approach of asking whether the injury would require a free world person to visit a doctor or emergency room) (citing Luong v. Hatt, 979 F. Supp. 481, 486 (N.D. Tex. 1997)). Thus, Defendants' Motion is due to be denied to the extent that the Court finds Palmer's request for monetary damages is not precluded under § 1997e(e) because he alleges that he suffered physical injuries that are plausibly greater than de minimis.

### D. Plaintiff's Newly-Asserted Claims

In his Response (Doc. 53), Palmer asserts that Defendant Hampton threatened him, tried to force him "to drop the case," told inmates that Palmer was a "baby raper," tried to coax inmates to assault Palmer, and denied Palmer recreational activity. Response at 19-20. In support of his assertions, Palmer submitted the Declaration of Terry Newkirk, Jr. (FDOC # A51876) who described what he witnessed while confined with Palmer in V dormitory in 2020. See Doc. 53-2 at 8. Insofar as Palmer asserts a First Amendment

42

retaliation claim and other claims (based on events that allegedly occurred in 2020) against Defendant Hampton in his response to Defendants' summary judgment motion, the Court determines that raising new legal claims against Defendant Hampton for the first time at this stage of the litigation is impermissible. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("The central issue in this case is whether a non-moving party plaintiff may raise a new legal claim for the first time in response to the opposing party's summary judgment motion. We hold it cannot."). Thus, the Court determines that Palmer is not permitted to pursue his new claims against Defendant Hampton in this case.

In consideration of the foregoing, it is now

**ORDERED**:

1.    Defendants' Motion for Summary Judgment (Doc. 41) is **GRANTED** as to (1) Plaintiff's Eighth and Fourteenth Amendment claims against Defendant Biascochea, and (2) Defendant Biascochea's assertion of qualified immunity as to Palmer's Eighth and Fourteenth Amendment claims against her. Otherwise, the Motion is **DENIED.** Judgment in Biascochea's favor will be withheld pending adjudication of the action as a whole. See Fed. R. Civ. P. 54.

2.      The parties must confer in good faith to discuss the issues and the possibility of settlement as to Palmer's remaining Eighth Amendment claims for excessive use of force against Defendants Hampton, Oliver, and Bryan. **No later than October 20, 2021**, the parties must notify the Court whether they are able to reach a settlement. If the parties are unable to settle the case privately among themselves, they must notify the Court if they wish to have the case referred to a United States Magistrate Judge for a settlement conference. Otherwise, the Court will enter a case management order, set a trial date, and direct the parties to begin trial preparations.

**DONE AND ORDERED** at Jacksonville, Florida, this 8th day of September, 2021.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-1 9/7
c:
LeSamuel Palmer, #L41847
Counsel of Record